# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0059V

| | |
|---|---|
| MARLENE BORMAN,<br><br>                       Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                       Respondent. | Chief Special Master Corcoran<br><br>Filed: June 27, 2023 |

*Michael Pottetti*, Law Office of Michael Pottetti, Port Jefferson, NY, for Petitioner.

*Traci R. Patton*, U.S. Department of Justice, Washington, DC, for Respondent.

### **FACT RULING**[1]

      On January 21, 2020, Marlene Borman filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), which she later amended. Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from a tetanus diphtheria acellular pertussis ("Tdap") vaccine received on October 1, 2018.[3] Amended Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] The amended petition includes two different vaccination dates, October 1, 2018 and January 9, 2019. Amended Petition at 1. However, the vaccine record indicates that the Tdap was received on October 1, 2018. Ex. 4 at 2.

For the reasons discussed below, I find that a preponderance of the evidence supports a finding that Petitioner's shoulder pain began within 48 hours after vaccination.

## I.     Relevant Procedural History

The case was activated on March 26, 2020 (ECF No. 11). Following an initial status conference, Petitioner filed an amended petition and additional evidence (ECF Nos. 14-16, 23).

On April 19, 2021, Respondent filed a status report stating that he had completed his review of the case and identified missing medical records (ECF No. 26). The following day, Petitioner filed a status report objecting to several of the records request as unrelated and irrelevant, but agreeing to others (ECF No. 27). Following a status conference on August 13, 2021, Petitioner was directed to file additional records and a statement of completion (ECF No. 30). Petitioner filed additional records in October and November 2021 (ECF Nos. 32, 33, 35).

On December 17, 2021, Respondent filed his Rule 4(c) Report setting forth his view that compensation is not appropriate in this case (ECF No. 37). Petitioner thereafter filed additional evidence (ECF No. 38). Following a status conference, a briefing schedule was set (ECF No. 39).

On March 14, 2022, Petitioner filed a motion for a ruling on the record on the issue of onset (ECF No. 40). Respondent responded on April 28, 2022 (ECF No. 41). Petitioner did not reply. The issue of the onset of Petitioner's shoulder pain is now ripe for resolution.

## II.    Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding the claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration

as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.

---

[4] In summary, a petitioner must establish receipt of a vaccine covered by the Program, administered either in the United States and its territories, or in another geographical area but qualifying for a limited exception; that residual effects of the injury continued for more than six months (or meet the severity requirement in other ways not applicable in this case); and no civil suit has been filed and no award or settlement has been collected for the injury. *See* Section 11(c)(1)(A)(B)(D)(E).

3

>SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
>(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
>(ii) Pain occurs within the specified time frame;
>
>(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
>(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### III. Relevant Factual History

#### A. Medical Records

On October 1, 2018, Petitioner, a pre-kindergarten teacher, received a Tdap vaccine intramuscularly in her right deltoid at a CVS in Valley Stream, New York. Ex. 4 at 1-2; Ex. 8 at 18. Two months later, on December 8, 2018, she presented to her primary care physician ("PCP"), Dr. Usha George, for routine blood work. Ex. 5 at 4. The record indicates that she denied having joint pain. *Id.* On examination, her bones and joints were recorded as normal. *Id.* at 5. The record does not indicate that Petitioner was having any difficulty with her arm or shoulder or requested care for it.

4

A month and a half later, on January 23, 2019, Petitioner returned to Dr. George. Ex. 5 at 7. She now complained of "right elbow pain that radiated down to her wrist." *Id.* She also complained of "pain at the site of TDaP injection on 10/2018." *Id.* She described it as mild and persistent. *Id.* Dr. George assessed her with pain in her wrist and medial epicondylitis, and prescribed diclofenac. *Id.* at 8.

Petitioner returned to Dr. George on February 9, 2019 complaining of elbow and arm pain that was worsening. Ex. 5 at 10. She was referred to an orthopedist. *Id.* at 11.

Three days later, on February 12, 2019, Petitioner saw orthopedist Dr. Craig Levitz. Ex. 6 at 4. She reported right shoulder and right elbow pain following a Tdap vaccination in October, with pain extending from the insertion site into her elbow. *Id.* She described it as a dull pain, and stated that her whole arm had been numb. *Id.* She reported pain with lifting on external rotation. *Id.* A section of the record titled "Injury Details" states that the cause of the injury was due to vaccine displacement, and the date was "october." *Id.* It further states that "the injury took place during or around the hours of cvs evening." *Id.* Her pain level was six when active, and seven at rest. *Id.* She reported that she had not been treated for this problem before. *Id.* On examination, her right shoulder was tender at the anterior shoulder and lateral shoulder. *Id.* at 5. Dr. Levitz documented full range of motion without pain in all planes of motion, with positive impingement testing. *Id.* An x-ray was negative for fractures, subluxations or dislocations. *Id.* at 6. Dr. Levitz assessed Petitioner with right shoulder pain and recommended an MRI and physical therapy. *Id.*

Petitioner underwent a right shoulder MRI on February 20, 2019. Ex. 6 at 8-9. The MRI report noted a history of "prior injection 10/2018. Patient states that after injection she developed pain in right shoulder down arm." *Id.* at 8. The MRI revealed supraspinatus tendinosis, infraspinatus calcific tendinosis, subdeltoid bursitis, intra-articular biceps tendinosis, a superior labrum tear, and glenohumeral joint effusion with joint fluid, synovitis, subscapular recess, and evidence of adjacent subscapularis muscle reactive edema. *Id.* at 8-9.

Petitioner returned to Dr. Levitz on March 5, 2019 to review the MRI results. Ex. 6 at 1. She reported that she was still having tingling in her forearm and fingers. *Id.* Dr. Levitz assessed her with calcific tendinitis of the right shoulder and a superior glenoid labrum lesion, and recommended a home exercise program, with follow up as needed. *Id.* at 3. She declined a cortisone injection. *Id.*

On March 14, 2019, Petitioner presented for a physical therapy ("PT") evaluation. Ex. 8 at 18. She reported right shoulder pain that started after a Tdap vaccine in her right shoulder and had progressively worsened. *Id.* She also reported intermittent numbness and tingling down her right upper extremity to her fingers and neck tightness. *Id.* On examination, her right shoulder active range of motion was painful and slightly reduced

compared to her left shoulder, with 150 degrees in flexion (compared to 170 degrees on the left) and 165 degrees in abduction (compared to 175 degrees on the left).[5] *Id.* She reported a pain level of five out of ten at best and ten out of ten at worst. *Id.* She had positive empty can, speed's, and Hawkins-Kennedy results on her right shoulder. *Id.* She continued PT through December 18, 2019. *Id.* at 1-17.

On March 18, 2019, Petitioner presented to orthopedist Dr. Eric Freeman for a second opinion. Ex. 7 at 7. She reported that a Tdap vaccine received at CVS in October 2018 "seemed to throw off her shoulder." *Id.* On examination, Neer and Hawkins impingement tests were positive in her right shoulder. *Id.* at 8. Yergason's and Speed's testing were negative, and she had mild pain over the medial epicondylar region of her elbow. *Id.* She reported a pain level of five. *Id.* He recommended conservative care and deferring an injection for a few weeks to see if PT helped. *Id.*

Petitioner returned to Dr. Freeman a month later, on April 25, 2019, requesting an injection.[6] Ex. 7 at 5. Dr. Freeman administered an ultrasound-guided Depo-Medrol injection. *Id.* at 6.[7]

### B. Affidavits

Petitioner filed seven affidavits in support of her petition. Exs. 2, 3 (containing four separate affidavits), 26, and 27.[8]

Ms. Borman avers that she received the Tdap vaccine at CVS the evening of October 1. Exs. 2 at. ¶ 8; 26 at. ¶ 5. The vaccine was required by the New York City Department of Health for her job as a preschool teacher. Ex. 2 at. ¶ 7. She felt pain in her right deltoid as soon as she received the vaccine, and "immediately became incapable of using [her] right arm." *Id.* at ¶ 9. She states that her arm was inflamed, hot to the touch, and very sore. *Id.* She could not sleep that night or the entire week thereafter due to pain.

---

[5] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion and 170 to 180 degrees in abduction. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80 (F. A. Davis Co., 5th ed. 2016).

[6] The record indicates that she requested "another injection" and stated that her "last injection was a couple of months ago." Ex. 7 at 5. However, it appears that she declined a cortisone injection previously. Ex. 6 at 3.

[7] Petitioner underwent additional care that is not relevant to the onset issue at hand.

[8] Because Frances Eugenis avers that she did not know Ms. Borman until January 2021, well after vaccination, and does not provide information about onset, this affidavit (Ex. 27) is not discussed further herein.

Ex. 26 at. ¶ 5. The next day she went to work and her shoulder was warm to the touch. *Id*. at ¶ 6. The gym wall was cool, and putting her arm against the wall helped alleviate some pain. *Id*. She tried to ice it and took Motrin, but nothing helped. Exs. 2 at ¶ 10; 26 at ¶¶ 7-8. At some point within approximately two to three weeks after vaccination,[9] she returned to CVS and complained about her pain to the pharmacists, who told her to continue icing her arm. Exs. 2 at ¶ 10; 26 at ¶ 9. She reports that after receiving the vaccine, "everything has become more difficult to do" and she has struggled to make her bed, do laundry, dress and undress, drive to work, and perform her job. Ex. 2 at ¶¶ 21, 22. She recalls telling her husband and adult children that they would have to take over walking her dog due to her arm pain, although no timeline is provided. Ex. 26 at ¶ 10.

Petitioner's pain was "strictly in the upper arm in October of 2018." Ex. 26 at ¶ 11. At some point in late November or early December, the pain "was moving downward toward [her] elbow" and felt like a bruise, painful to the touch. *Id*. at ¶ 12. She recalled wrapping her elbow and arm about six to eight inches above it in an ACE bandage, although it is not clear when this occurred. *Id*. at ¶ 13. She did not see a doctor immediately because at CVS she was told to give it time. *Id*. at ¶ 15. When she went in for routine blood work in December 2018, she was not asked about her pain or other health issues, although she recounts that she was in pain at that time. *Id*. at ¶ 16. She states that the pain in her arm and elbow got progressively worse instead of improving, which is why she saw Dr. George on January 23, 2019. *Id*. at ¶ 17. She explains that her physical therapist told her that her radial nerve was likely impacted, in addition to possibly her median and ulnar nerve. *Id*. at ¶ 20.

Petitioner's husband, Gregory Borman, states that after vaccination on October 1, 2018, Ms. Borman "has been in constant pain and discomfort." Ex. 3 at 1 ¶ 5. Her sleep has been compromised, and contact or pressure from another person such as a hug triggers pain. *Id*. He recalls her complaining of pain if she moves too quickly to reach above, below, or behind something, and needing help carrying groceries. *Id*. at 1 ¶ 6. She has to use her left arm for most tasks. *Id*.

Margarita Ginzburg submitted an affidavit in support of the case. Ex. 3 at 2. She states that she has known Ms. Borman since November 2016. *Id*. Although she does not explain how they are acquainted, the content of her affidavit suggests that their relationship may stem from Petitioner's job duties. *Id*. Ms. Ginzburg states that after the October 1, 2018 vaccination, Ms. Borman "has been unable to perform [her] job responsibilities" due to her injury, and "has difficulty raising her arm to reach for the mats

---

[9] In her initial affidavit, Petitioner stated she returned to CVS "[a]fter three weeks." Ex. 2 at ¶ 10. In her supplemental affidavit, she stated she could not remember exactly when this visit took place but it was "[w]ithin two weeks of the vaccine." Ex. 26 at ¶ 9.

that are on a high shelf, that the children sleep on." *Id.* at 2 ¶ 5. She adds that "[s]ince Marlene Borman received the vaccination, I've observed that she has had a much more difficult time doing the tasks that she used to do, for example Marlene has trouble holding anything heavy, vacuuming, sweeping the floor, tying shoelaces, handing out papers to parents because of numbness in her fingers and pain in her arm." *Id.* at 2 ¶ 7.

Maria Sakkas averred that she works in the classroom next door to Ms. Borman and has known her since September 2016. Ex. 3 at 3 ¶ 2. Ms. Sakkas states that the day after vaccination she saw Ms. Borman in the parking lot and she complained about throbbing pain and needed assistance with her bags because she could not carry them. *Id.* at 3 ¶ 4. Ms. Sakkas recalled Ms. Borman dropping a cup from her right hand during a faculty meeting due to pain and numbness in her arm and fingers, although she does not clarify when this happened. *Id.* at 3 ¶ 6.

Tetiana Pavlyshche averred that she has known Ms. Borman since September 2016. Ex. 3 at 4 ¶ 2. Ms. Pavlyshche does not explain her relationship to Ms. Borman, although she discusses work duties, suggesting that they are acquainted through Petitioner's work. *Id.* She recalls witnessing Ms. Borman coming to school in "throbbing pain," with compromised mobility, the day after vaccination. *Id.* at 4 ¶ 5. Ms. Pavlyshche states that Ms. Borman iced her arm in the classroom and took Motrin for the "next several weeks." *Id.* She recalls Ms. Borman complaining of sharp pain in her right shoulder "[a]fter receiving the vaccine," but does not provide a more precise timeline. *Id.* at 4 ¶ 6. She recalls Ms. Borman having a facial expression of severe pain and "seeing stars" during nap time, but does not indicate when this occurred. *Id.* Since the vaccination, Ms. Pavlyshche observes that Ms. Borman has had much more difficulty doing everyday work tasks such as lifting chairs, sweeping, wiping tables, and working with children. *Id.* at 4 ¶ 7.

### IV.   The Parties' Arguments

Petitioner attributes the December 2018 record's silence on her shoulder pain to the fact that it pertained to "a routine blood work appointment where other injuries are not typically discussed." Petitioner's Motion for Ruling on Onset, filed Mar. 14, 2022, at *5 (ECF No. 40) ("Mot."). Petitioner adds that "nobody asked her questions about her pain or any other health issue." *Id.* With regard to the denial of joint pain also set forth in that record, Petitioner asserts that "[t]his should not be taken at face value, because . . . the blood work appointment was routine, and the standard questions about 'bones, joints, reflexes, strength and muscle tone, were not asked to the petitioner." *Id.* Petitioner further notes that that she is married and the record incorrectly states she is single, further casting doubt on its reliability. *Id.*

Petitioner also asserts that she "did what most people do, try to limit the pain and keep continuing with her daily activities and busy lifestyle." Mot. at *5. She hoped the pain would subside. *Id.* at *6. Petitioner argues that medical records may be outweighed by testimony given later in time that is consistent, clear, cogent, and compelling. *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (*citing Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611 (Fed. Cl. Spec. Mstr. June 30, 1998)). Mot. at *6.

Respondent argues that Petitioner did not present to any physician or urgent care to report any right-sided upper extremity pain until January 23, 2019, 144 days after her Tdap vaccination. Response to Petitioner's Motion, filed Apr. 28, 2022, at *12 (ECF No. 41) ("Opp."). Further, at this appointment Petitioner reported elbow, wrist, and vaccination site pain – not shoulder pain. *Id.* Respondent emphasizes that Petitioner had an opportunity to report her arm pain over a month earlier, on December 8, 2018, but instead reported an *absence* of joint pain at that time. *Id.* at *12-13.

Respondent takes issue with Petitioner's claim in her affidavit that the Tdap vaccine immediately made her right arm incapable of use, suggesting that if she truly was incapable of using her arm after vaccination, it would logically follow that she would discuss her condition with her doctor as soon as possible. Opp. at *12 n.9.

Respondent then argues that testimony that conflicts with medical records is entitled to little weight. Opp. at *14 (*citing Cucuras*, 993 F.2d at 1528). Respondent adds that "written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." Opp. at *15 (*citing Reusser v. Sec'y of Health & Human Servs*., 28 Fed. Cl. 516, 523 (1993)). In Respondent's view, "petitioner's testimony about onset is neither reliable nor consistent." Opp. at *15. More than a year afterward, and for purposes of litigation, Petitioner claimed that she was immediately *incapable* of using her right arm after the Tdap vaccination. *Id.* For a complaint this serious, Respondent asserts it would be reasonable to expect that a person would seek medical care promptly, which Ms. Borman did not do. Opp. at *15-16.

Respondent further notes that the QAI for SIRVA require limited range of motion, and that when Petitioner saw an orthopedist on February 12, 2019, she was noted to have full range of motion of her shoulder. Opp. at *16-17. Respondent asserts that subsequent examinations also found full range of motion and full mobility, which Respondent asserts is "not consistent with Table SIRVA." *Id.* at *17.

Respondent notes that the SIRVA QAI requires that pain be limited to the shoulder where the vaccine was administered, which Respondent asserts is not met in this case. Opp. at *17. Respondent notes that Petitioner consistently complained of pain extending beyond her right shoulder, citing appointments where she complained of pain in her right

9

elbow and wrist, arm pain, pain down the arm, and numbness and tingling throughout the arm into the fingers. *Id.*

Finally, Respondent asserts that Petitioner cannot establish the fourth SIRVA QAI, which requires that she not have any other condition or abnormality that would explain her symptoms, because she exhibited symptoms of neuropathy. Opp. at *18.

## V.     Analysis

After a close review of the record, I find that a preponderance of the evidence supports (although just *barely*) a finding that Petitioner suffered shoulder pain within 48 hours of vaccine administration. The same records also, however, attest to the mild nature of the injury, and other considerations that suggest the claim should not lead to a significant damages demand.

Although the start of Petitioner's treatment was delayed, records thereafter consistently associate Petitioner's injury with the vaccine she received. Petitioner first reported pain related to the Tdap vaccination to her PCP three and a half months after vaccination. Ex. 5 at 7. At her first orthopedist appointment four months after vaccination, she reported right shoulder *and* elbow pain "following" a Tdap vaccination. Ex. 6 at 4. The same record indicated that her injury took place in "october" and "during or around the hours of cvs evening." *Id.* She averred that she received the vaccine at CVS in the evening. Ex. 26 at ¶ 5.

When Petitioner began PT, she reported right shoulder pain that began "after" her Tdap vaccination. Ex. 8 at 18. She later reported to Dr. Freeman that the Tdap vaccination seemed to "throw off" her shoulder. Ex. 7 at 7.

Petitioner's affidavit evidence has some indications of immediate pain. However, this category of evidence is not consistent with the medical records and provides little supporting detail, reducing its persuasive value.

Petitioner indicates that her pain began as soon as she received the vaccine, and that she was immediately incapable of using her right arm. Ex. 2 at ¶ 9. However, she provides little supporting detail, and there is no other evidence that would corroborate a complete and immediate inability to use her right arm. The affidavit evidence does indicate that she had difficulty and pain with activities of daily living, but not rising to the level of complete inability to use her arm.

10

Ms. Sakkas avers that the day after vaccination Petitioner complained of pain and needed help with her bags. Ex. 3 at 3 ¶ 4. However, because this affidavit was signed over a year later and is silent as to how Ms. Sakkas is able to remember the precise date of the incident, its persuasive effect is reduced. Similarly, Ms. Pavlyshche states that she witnessed Ms. Borman coming to school in throbbing pain with compromised mobility the day after vaccination, although she does not indicate how she knew that Petitioner was in pain or experiencing compromised mobility. Ex. 3 at 4¶ 5.

When Petitioner was seen by her PCP two months after vaccination, she denied joint pain, and her bones and joints were normal on examination. Ex. 5 at 4-5. This record weighs against Petitioner's claim. It is particularly difficult to reconcile Petitioner's claim that her right arm was *immediately unusable* with the fact that she did not seek *any* medical care at all for her injury until nearly four months after vaccination, especially given that she was seen by her PCP during that timeframe. I decline Petitioner's suggestion that I disregard this record. *Cucuras*, 993 F.2d at 1528.

Nevertheless, and despite Petitioner's delay in seeking care (particularly in light of her intervening PCP appointment) and inconsistency between her condition as documented in the medical records compared to affidavits, there is record evidence supporting her position. Once she sought care for her shoulder, she consistently related her shoulder pain to the Tdap vaccination. She indicated that that her pain began after her October Tdap vaccination in the evening at CVS (Ex. 6 at 4), that the vaccination "threw off" her shoulder (Ex. 7 at 7), that her pain started after vaccination (Ex. 6 at 8; Ex. 8 at 18), and that she had pain at the injection site (Ex. 5 at 7). While this is a close case, a preponderance of the evidence supports a finding that her pain began within 48 hours of vaccine administration. Petitioner's motion is GRANTED.

## VI.  Other Matters

My onset determination does not resolve all entitlement issues in this case. It appears that Petitioner may not be able to satisfy the third QAI for SIRVA, which requires that pain and reduced range of motion be limited to the shoulder where the vaccine was administered. As the records reveal, Petitioner had well-documented symptoms in her elbow, wrist, and neck. Exs. 5 at 7, 8, 10; 6 at 1, 4; 8 at 18; 7 at 8 At initial presentation, the record suggests that her elbow pain was her main concern. Ex. 5 at 7.

Accordingly, there remains risk that the Table claim might not be tenable. If Petitioner wishes to add a causation in fact claim as a "hedge" against the former's dismissal, she must file an amended petition asserting such a claim. Any such amended petition must also correct the vaccination date in the preamble. And any such claim would

need to satisfy the standard set forth in *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

Based on the records before me, including Petitioner's delay in seeking care, it appears that Petitioner's injury was fairly minor, and thus any award would likely be modest, regardless of what version of the claim were to prevail.[10] The parties are strongly encouraged to negotiate, to see if a demand that takes into account Petitioner's significant litigation risk could be fashioned that would be acceptable to Respondent.

Accordingly:

- **I find that Petitioner's onset of her shoulder pain likely occurred within 48 hours of vaccination.**

- **Petitioner is directed to file, by <u>Friday, July 21, 2023</u>, the following:**

    - **An amended petition, if Petitioner wishes to proceed with a causation in fact claim; and**

    - **A status report stating whether and when Petitioner has served a demand on Respondent, and providing any further update on the parties' negotiations.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[10] This is particularly so in light of the settlement Petitioner already received from CVS, which Respondent correctly asserts would offset any award. Ex. 10; Respondent's Rule 4(c) Report at *8 n.8.